IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: TRANS UNION, LLC, CUSTOMER DATA SECURITY BREACH LITIGATION | Case No. 25 CV 10320 <br> MDL No. 3170 <br> Judge Robert W. Gettleman |
| This Document Relates to All Cases | Magistrate Judge David Weisman |

**FED. R. CIV. P. 16.1 REPORT**

The *Snelgrove* Plaintiffs, by and through their attorneys of record, submit the following Report pursuant to Fed. R. Civ. P. 16.1 and the Court's Case Management Order #2 (Dkt. No. 23) ("CMO #2"). Although other counsel may not agree that a robust approach to this Report was necessary, in an abundance of caution, the *Snelgrove* Plaintiffs submit this Report detailing a response to each of the requirements in Rule 16.1 and CMO #2.

"The court ordinarily should order the parties to meet to submit a report to the court about the matters designated in Rule 16.1(b)(2)-(3) prior to the initial management conference. This should be a single report, but it may reflect the parties' divergent views on these matters." Fed. R. Civ. P. 16.1(b)(1) Advisory Committee's note.[1]

**I.     Nature of the Case**

On July 28 and 29, 2025, threat actors conducted a social engineering attack on TransUnion and exfiltrated the personally identifiable/financial information, including dates of birth, social

---

[1] The *Snelgrove* Plaintiffs recognize that the parties were directed to meet and confer and that the parties should enter a single report. *See* CMO #2; Fed. R. Civ. P. 16.1(b)(1) Advisory Committee's note. The *Snelgrove* Plaintiffs were unable to achieve this despite efforts to confer with Defendant's and other Plaintiffs' counsel. As the *Snelgrove* Plaintiffs' counsel ("Cole & Van Note" or "CVN") is aware that other counsel wish to meaningfully participate in this ligation, it welcomed everyone weighing in on this Report before filing. CVN did not receive any constructive feedback on the substance of the Report. On January 5, 2026, a one paragraph Joint Status Report was filed, thus prompting the rushed filing of this Report before the January 15, 2026 deadline.

security numbers and contact information ("PII"), of Plaintiffs and a putative class of roughly 4,461,511 TransUnion customers (the "Data Security Event"). TransUnion claims the breach was closed within hours of being discovered on July 30, 2025. TransUnion issued a notice of public disclosure of the Data Security Event on or about August 26, 2025.

During the Data Security Event, the threat actors posed as help desk technicians to gain limited access to a discrete segment of TransUnion's Salesforce environment. As far back as June 5, 2025, Salesforce started alerting its customers (including TransUnion) to a "voice" phishing (aka "vishing") scheme where criminals posing as Salesforce representatives were convincing administrative staff (over the telephone or via other voice communication modes) of Salesforce's clients to download a malicious and imposter version of the Salesforce Data Loader app. The Salesforce Data Loader app facilitates the importing of customer data into the Salesforce software and, thus, would allow access to the customer PII of Defendant and various other Salesforce clients.

Google Threat Intelligence Group (or "GTIG") designated the group responsible for the "vishing" attack on TransUnion as UNC6040, also known as "ShinyHunters." ShinyHunters leveraged the stolen data to extort the victim organizations by threatening to publish the compromised information online via a "data leak site." This threat to Defendant was fully realized on October 3, 2025 when that data leak site went live. The data leak website was shut down by the FBI on October 10, 2025.

Plaintiffs and TransUnion agree that the also well-publicized "Salesloft Drift" data incident which occurred in mid-2025 and which impacted numerous other Salesforce clients did not appear to involve or exfiltrate data from *TransUnion*. Indeed, the Salesloft Drift incident appears to have been a "supply chain" attack that exfiltrated consumer information via the Salesloft app used by

2

some Salesforce clients. The Salesloft Drift attack was perpetrated by a threat actor group classified simply as "UNC6395," a separate entity than the one which previously hacked TransUnion's network (i.e., the foundation for this MDL litigation).

## II. <u>Whether leadership counsel should be appointed.</u>

As the lead case, the *Snelgrove* Plaintiffs do not believe competitive briefing for formal leadership appointment is necessary and, rather, propose an approach that allows for all counsel with an interest in this litigation to participate meaningfully and by choice.[2] To effectuate this, while Cole & Van Note, counsel for the first-filed *Snelgrove* Plaintiffs, would ultimately answer to the Court for all aspects of the litigation, including filing of documents and court appearances, it should also be charged with meeting and conferring with all Plaintiffs' counsel within 15 days after the upcoming initial case management conference (envisioned by FRCP Rule 16.1(a) and ordered by this Court) to assemble a Plaintiffs' Steering Committee ("PSC") to manage the litigation, and to appoint subcommittees for (1) vetting representative Plaintiffs, preparing the Consolidated Complaint and associated motion work; (2) conducting discovery and handling discovery motions; (3) performing class certification briefing, and liaising with any damages modeling experts; and (4) to handle ADR/settlement efforts, as appropriate.[3] *Manual* §§ 10.221

---

[2] *See, generally*, various models for leadership discussed in the Manual for Complex Litigation, Fourth ("*Manual*"), §§ 10.221 and 40.22, and the Third Circuit Task Force on the Selection of Class Counsel Final Report, January 2002 ("*TCTF Report*"). As discussed in those sources, auctions for leadership carry various downsides including inflated fees, "cartel-like" groupings, overstaffing, etc. *TCTF Report* at p. 10. "Appointment of leadership counsel is not universally needed in MDL proceedings, and the timing of appointments may vary." Fed. R. Civ. P. 16.1(b)(2)(A) Advisory Committee's note.

[3] "In some MDL proceedings it may be important that leadership counsel be organized into committees with specific duties and responsibilities. Rule 16.1(b)(2)(A)(ii) therefore prompts counsel to provide the court with specific suggestions on the leadership structure that should be employed." Fed. R. Civ. P. 16.1(b)(2)(A) Advisory Committee's note.

and 40.22. As the matter moves toward trial, additional counsel and/or committees may assume additional roles, such as addressing evidentiary challenges and trial preparation.

Such PSCs are common in large scale litigation and one would be appropriate here. To the extent the number of counsel seeking PSC appointment is unwieldy, Cole & Van Note counsel ("CVN") will work with interested counsel to narrow the requests for participation or, barring complete success there, will either be empowered to make appropriate selections or submit to the Court a position statement regarding any areas of disagreement, for the Court's consideration. Certainly, while no approach to leadership is perfect, the approach outlined here is preferable to an arduous leadership battle and/or what may well become a popularity contest among numerous slates of counsel (e.g., by virtue of them having worked together before), after which the vast majority of quality attorneys in the 60+ lawsuits filed to date will be left with virtually no voice in the direction for this litigation. Leaving the first filed case and its counsel to primarily direct the litigation, but with the egalitarian requirement of appointing a PSC, also saves considerable judicial resources, reduces duplication of effort, and allows the matter to move forward in an inclusionary manner with minimal additional delay.

Cole & Van Note is eminently qualified to lead the PSC for several reasons. As an initial matter, the first to file a class action complaint against a defendant is generally in "a better position to represent the class fairly and adequately than" those who filed after because the first to file "[has] been involved in [the] litigation for the longest time period and [has] performed the most work in identifying and investigating potential claims." *Walker v. Discover Fin. Servs.*, No. 10-cv-6994, 2011 U.S. Dist. LEXIS 58803, at *11 (N.D.Ill. May 26, 2011). Indeed, it is unlikely any firm can say it has performed more work on this matter than CVN. Thus, as can be further

4

discussed at the initial Case Management Conference, the Court should give deference to this and appoint CVN and, specifically, Mr. Cole, as the lead management counsel.[4]

Second, Mr. Cole has litigated class actions for well over 30 years, handling and leading cases in the areas of mass tort, employment, consumer fraud and data breach, and has been court appointed as lead or co-lead counsel in dozens of data breach class action matters in a multitude of jurisdictions. As such, he has successfully led teams of attorneys to successful results on numerous occasions.

Third, CVN has taken an active—probably the most active—role in this ligation thus far, further evidencing its commitment to its effective prosecution. CVN filed the first action, has conducted scores of hours of research to fully understand the factual underpinnings of this Data Security Event, and filed briefs in MDL 3164 as well as MDL 3170—taking positions that the JPML ultimately and completely adopted. Mr. Cole also argued at the Austin, Texas MDL hearings in December, reaching out, in advance of the hearings, to various counsel intending to present there so as to coordinate their arguments. Despite the JMPL's requirement that counsel meet and confer in that manner, few other counsel did so. And, since issuance of the Panel's transfer Order, Mr. Cole has continued to coordinate with other Plaintiffs' counsel. In December, CVN contacted Defendant and the other Plaintiffs' counsel notifying them that CVN would be drafting the initial Rule 16.1 Report, pursuant to CMO #2, for their review and asked for suggestions as to the contents of the document and to meet and confer. CVN made additional attempts to meet and confer by

---

[4] "The Manual [for Complex Litigation, Fourth § 21.11] elaborates that [class counsel] appointment should occur before (or at) the initial case management conference, particularly in instances where class actions may be consolidated and where a number of lawyer may compete for class counsel appointment—the situation in most class action MDLs. . . ." Statement from Norm E. Siegel to Committee on Rules of Practice and Procedure (Jan. 16, 2025) (testifying as to proposed Rule 16.1).

5

phone and email, but no substantive suggestions regarding the content of the Report were provided. CVN then began drafting the Report. Almost two weeks later, another firm circulated a one paragraph report to Plaintiffs' counsel which did not address the issues this Court ordered the parties to address. CVN explained that it believed the truncated report did not comply with the Court's CMO #2. CVN explained that CMO #2 appears to require a much more robust discussion of each of the subparts therein. CVN did not receive any constructive feedback on the substance of the Report. CVN will attend the upcoming conference prepared to discuss all aspects of this litigation.

Fourth, not only does CVN have ample resources to effectively prosecute this case, but it is committed to using these resources to do so. CVN is committed to efficiently pursuing the best interests of the proposed class, and fully understands the investment of time and resources necessary for a successful resolution. CVN has made—and will continue to make—the required investments here.

*Snelgrove* Plaintiffs' recommendation that all activity impacting the MDL proceedings be conducted through lead counsel is consistent with the *Manual* at, *inter alia*, §§ 10.221 and 40.22. As discussed therein, lead counsel should be generally responsible for the overall conduct of the pre-trial litigation on behalf of the putative class, adopting (here, with the appointment of PSC members to the roles discussed above), the following specific responsibilities:

1. To determine and present (in briefs, oral argument or such other fashion as may be appropriate, personally or by a designee) to the Court and opposing parties the position of Plaintiffs and putative class members on all matters arising during pretrial proceedings;

2. To coordinate the initiation and conduct of discovery on behalf of Plaintiffs and putative class members, consistent with the requirements of Fed. R. Civ. P. 26(b)(1), 26(b)(2) and 26(g), including the preparation of joint interrogatories and requests for the production of documents and the examination of witnesses in depositions;

3. To conduct settlement negotiations on behalf of Plaintiffs and putative class members, and, where appropriate, to present any proposed settlements to the Court on behalf of putative class members;

4. To delegate specific tasks to other counsel, in a manner designed to ensure that pretrial preparation for Plaintiffs and the putative class is conducted efficiently and effectively;

5. To enter into stipulations with opposing counsel as necessary for the conduct of the litigation;

6. To prepare and distribute status reports to any other law firms that might seek to represent the putative class; to maintain adequate time and disbursement records covering services as Interim Co-Lead Class Counsel;

7. To monitor the activities of any other law firms that might seek to represent putative class members to ensure that schedules are met, and unnecessary expenditures of time and funds are avoided; and

8. To perform such other duties as may be incidental to the proper prosecution and coordination of pretrial activities on behalf of Plaintiffs and the putative class or authorized by further order of this Court.[5]

Finally, the approach respectfully proposed here is in line with authorities which endorse and prefer "self ordering" and note that it is "[b]y far the most common" method by which leadership is determined in class actions. *Manual* § 21.272; *see also*, §§14.211 and 40.22; *TCTF Report*.[6]

Further Case Management Conferences. As this is complex ligation, the case will require enhanced judicial oversight. Thus, *Snelgrove* Plaintiffs suggest scheduling case management conferences at least every 90 days. Lead counsel will provide reports of major activities to non-lead counsel at, at least, the same time interval, and advocates appointment of a liaison counsel for

---

[5] Pursuant to the *Manual* at §§ 40.22, liaison counsel may be assigned additional duties, as may members of the PSC.

[6] "The traditional methods of selecting class counsel, with significant reliance on private ordering, are preferable to auctions in most class action cases." *TCTF Report* at 18 ("conclusions and recommendations").

handling such communications with all other Plaintiffs' counsel. Further, lead counsel will ensure copies of any case management documents filed with the Court are served upon all counsel in the proceedings. *Snelgrove* Plaintiffs propose a website for communications.[7]

Compensation to Counsel. A meaningful discussion as to how lead and PSC counsel will be compensated is probably premature at this time since questions regarding the trajectory for this MDL (e.g., whether early resolution is appropriate, what structure settlement might take) cannot currently be answered. Moreover, details surrounding roles of PSC counsel will naturally develop depending on the duration and path of the litigation—suggesting that discussion of a more specific compensation structure should be deferred until at least a second case management conference, at which time Plaintiffs' counsel can propose a common benefit work and billing protocol for the Court's consideration. *See, e.g., Manual* §§ 14.211-14.216 and 40.23.

**III.** **Whether any previously entered scheduling or other orders should be vacated or modified.**

*Snelgrove* Plaintiffs are not aware of any orders that should be vacated or modified, with the possible exception of the date of the initial case management conference. It is currently unknown whether various counsel who may wish to appear thereat are, in fact, available for personal appearances. To facilitate the fullest attendance, *Snelgrove* counsel respectfully requests that this first conference be conducted by remote appearance, with subsequent conferences being in person.

---

[7] "In some instances, the court or leadership counsel have created websites that permit nonleadership counsel to monitor the MDL proceedings, and sometimes online access to court hearings provides a method for monitoring the proceedings." Fed. R. Civ. P. 16.1(b)(1) Advisory Committee's note.

**IV.     A schedule for additional management conferences with the court.**

As discussed above, this complex ligation will require enhanced judicial oversight. Thus, *Snelgrove* Plaintiffs suggest scheduling case management conferences at least every 90 days.

**V.      How to manage the direct filing of new actions in the MDL proceedings.**

*Snelgrove* Plaintiffs propose that any new actions, regardless of where filed, be transferred to this Court. All such matters shall be subject to this Court's Orders immediately upon transfer.

**VI.     Whether related actions have been—or are expected to—be filed in other courts, and whether to adopt additional methods for coordinating with them.**

*Snelgrove* Plaintiffs expect few, if any, additional actions to be filed in other courts. As such, additional coordination protocols will not likely be needed. *Snelgrove* Plaintiffs' counsel has reviewed extensively the list of counsel in the 60+ cases filed in connection with this Data Security Event; it appears that most law firms that routinely represent clients in data breach litigation have already filed one or more cases here.

**VII.    Whether consolidated pleadings should be filed.**

Consistent with the inclusive approach outlined above, *Snelgrove* Plaintiffs suggest a Consolidated Complaint be filed. Lead counsel would assign a group of PSC members to synthesize the various pleadings, make decisions as which claims are viable, vet and select appropriate representative Plaintiffs and then, once approved by CVN, file the Consolidated pleading. Lead Plaintiffs' counsel would meet and confer with Defendant's counsel regarding the proposed claims for relief prior to filing the pleading, so as to obviate or at least reduce the need for a motion to dismiss, and work toward agreement on a pleadings motion briefing schedule, if needed. Counsel would present that schedule to the Court thereafter for consideration.

VIII. **How and when the parties will exchange information about the factual bases for their claims and defenses.**

*Snelgrove* Plaintiffs anticipate that, regardless of the above efforts, it is likely Defendant will file a Motion to Dismiss, as is common in data breach litigation practice. As such, *Snelgrove* Plaintiffs propose that further exchanges of information, whether formal or informal, be stayed until settlement of the pleadings or, in the event of early resolution efforts, that such exchanges be conducted informally between counsel.

IX. **Discovery, including any difficult issues that may arise.**

See, Section VIII, above.

X. **Any likely pretrial motions.**

In addition to a potential Motion to Dismiss, *Snelgrove* Plaintiffs anticipate traditional motion work such as the filing of a motion for summary judgment, motions *in limine*, *Daubert* and/or other evidentiary motions, a motion for class certification and, in the case of settlement, settlement approval motions. *Snelgrove* Plaintiffs recommend the timing of these and any other motions be addressed at a subsequent case management conference, after settlement of the pleadings.

XI. **Whether any matters should be referred to a magistrate judge or a master.**

*Snelgrove* Plaintiffs believe assignment of pre-trial matters to a magistrate judge is unnecessary but suggest the appointment of a special master for discovery and a special master for settlement. These appointments should be made at the earliest possible time to promote efficiency. If the Court agrees that the appointment of one or more special masters is appropriate, counsel for the parties should meet and confer within 30 days of entry of the Court's initial Case Management Order to discuss and attempt to agree on special master selections. If the parties cannot agree, within 20 days thereafter, the parties should submit their special master proposals to the Court for

consideration and selection. After appointment of each of these individuals, the parties will meet and confer to agree upon a schedule for an introductory call with each special master to outline a proposal for how the master can best assist the parties in moving this litigation forward efficiently and expeditiously.

**XII.** **The principal factual and legal issues likely to be presented.**

Plaintiffs are likely to present factual and legal issues including:

a. Whether Defendant breached its legal duty to Representative Plaintiffs and the Class by failing to implement adequate data security measures that allowed the Data Security Event to occur, failing to comply with Defendant's own policies/procedures and applicable laws, regulations and industry standards relating to data security, and failing to adequately, promptly and accurately respond to the data security event.

b. Whether Defendant is liable under each Count of the ultimate iteration of the Complaint.

c. How and when Defendant actually learned of the Data Security Event.

d. Whether this action can be maintained as a class action under Federal Rules of Civil Procedure Rule 23.

e. Whether Representative Plaintiffs and Class Members are entitled to actual and/or statutory damages and/or whether injunctive, corrective and/or declaratory relief and/or an accounting is/are appropriate as a result of Defendant's actions/inactions.

f. Sundry evidentiary issues, as they arise.

The parties look forward to discussing these issues with the Court at the upcoming Case Management Conference.

Dated: January 5, 2026 Respectfully Submitted,

*/s/ Scott Edward Cole*
Scott Edward Cole, Esq.
**COLE & VAN NOTE**
555 12th Street, Suite 2100
Oakland, California 94607
Telephone: (510) 891-9800
Email: sec@colevannote.com

*Counsel for Plaintiffs Daniel Snelgrove, et al. and the Proposed Class*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on January 5, 2026, the foregoing document was filed via the Court's ECF system, which will cause a true and correct copy of the same to be served electronically on all ECF-registered counsel of record.

*/s/ Scott Edward Cole*
Scott Edward Cole